## CHARLES A. DEUERLING *v.* CITY BAKING COMPANY.

[No. 59, January Term, 1928.]

*Decided April 20th, 1928.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Clarence A. Tucker* and *Frank F. J. Daily,* with whom were *Knapp, Tucker & Thomas* on the brief, for the appellant.

*P. August Grill* and *Randolph Barton, Jr.,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

The question presented on this appeal arises out of a contract of employment entered into between the appellant, as employee, and the appellee, as employer. The appellee is a bakery company, now and for a long time engaged in that general business in Baltimore City, and draws business from routes extending from Baltimore City into its suburbs and elsewhere, and particularly from the territory in the neighborhood of Hickory, Dublin, Castleton, Darlington, Stafford, Conowingo, and Belair, this particular territory being a subdivision prepared for convenience by the appellee and constituting one of its sales routes. A large portion of the appellee's general business is conducted by drivers or salesmen assigned to particular routes and supplied with a list of customers or prospective customers in the assigned territory. The appellant had been an employee of the appellee since 1916 as one of its driver-salesmen, and had assigned to him and traded with the customers in the territory above stated.

The contract between the parties was entered into on September 27th, 1927, and, after setting forth in its preamble the business of the company and how it is conducted, provided that the employee should receive as compensation for his services and for the full compliance with the terms, conditions,

and covenants of the agreement recited, eight per cent. of the sales made by him, that the commissions above recited should be in full payment for services rendered under the contract, and compensation in advance for not soliciting or selling products, similar to those sold or offered for sale by the company, in any territory covered by the employee for the company during the last six months of his employment, for three months after the representative shall have left the employ of his company, of his own accord or at the demand of the company. The contract further provides that the employment thereunder should begin on the 27th day of September, 1927, and continue in force from week to week thereafter, until it is terminated by the act of either party, but such termination is not to release the employee from the terms of the agreement yet to be performed by the employee at the time of the termination of the service. It further provides that the employee agrees, by reason of his financial circumstances, the difficulty of proof of damages, the compensation to be received thereunder, and other recitals therein first contained, that in event of any breach of the terms or conditions of this agreement on his part to be performed, a decree may be passed by any equity court in which a suit is brought for such purpose, enjoining him from violating the restrictive covenants. The bill of complaint alleges that on the 15th day of December, 1927, the appellant left the service of the appellee, and entered into the employ of the Schmidt Baking Company, Inc., on or about December 19th, 1927, and as such employee he is now trading with the customers of the appellee in the territory particularly described in the original contract of employment. Upon this bill a preliminary injunction was issued restraining the breach of the restrictive covenant contained in the contract. A demurrer was filed to the bill, and an appeal taken from the order granting the preliminary injunction.

We are called upon, therefore, to determine the single question of whether or not the action of the chancellor in granting the preliminary injunction was correct. The injunction restrained the appellant, his agents, servants, and

employees, they and each of them, from calling upon, soliciting, trading with, or attempting to trade with, either directly or indirectly, any person, persons, company, or corporation, who were the customers of the appellee in the territory set out in the bill of complaint and particularly described in the contract, for a period of ninety days from December 15th, 1927. The time for which the injunction was granted will have expired before the decision in this court, and, in that aspect of the case, in so far as the decision here could give injunctive relief, it could be of no benefit to either party. Upon the decision, however, does rest the question of who is liable for the costs of the appeal, and in addition, it is to be hoped that what we may here say will be of benefit in settling questions arising under a similar state of facts.

This case is an illustration of a very numerous class of decisions which courts are asked to make, which depend in large measure upon the particular facts and circumstances of each case, and for this reason, if it were possible, in our judgment it would be unwise, to promulgate or declare unchangeable rules to govern all cases. Even though this be true, it is essential to keep in mind the general principles to be applied to the varying facts in each case. We have here a contract the terms of which are explicit and unambiguous, solemnly executed by the parties thereto, fully competent to make such a contract. It is a contract of hiring, by which the employee agrees to perform definite, stipulated services in consideration of receiving stated compensation. By its terms it is to continue from week to week, and may be terminated by the act of either party. It provides that, in the event of its termination by either party, the employee agrees not to directly or indirectly for the period of three months after such termination solicit, sell, or attempt to sell or deliver any bakery products to any one located on the route assigned to him at any time during his last six months employment. The purposes of the contract are equally clear and definite as its terms, and are, to provide employment for the appellant, his services

for the appellee, and, at the termination of his service, to fix a period of three months, which said time the appellee is to have, to familiarize an employee substituted for the appellant with the customers along the route or routes served by the appellant during the last six months of his employment.

Restrictive covenants in contracts of employment, affecting the right of the employee to accept employment with others or engage in business for himself, may be divided into two classes, first, one not to accept employment with others during the term of the contract, and second, not to engage in a similar business or accept employment with others for a similar purpose for a definite period of time after the termination of the contract. Each of these classes of covenants, whether they be against similar employment during the term of the contract, or against engaging in business for one's self or in similar employment for another for a definite time after the termination of the contract, is in a degree in restraint of trade, for it is undeniable that the right to labor or use one's skill, talents, or experience for one's own benefit, or furnish them to another for compensation, is a natural and inherent right of the individual, and is often expressed by the term "freedom of trade." In the exercise of such a right the employee has an interest, as also the general public, who are entitled to have the energy, industry, skill, and talents of all individuals freely offered upon the market, and it can be easily imagined that by unreasonable curtailment, through restrictive covenants contained in contracts of employment, the public at large might thereby be deprived of the service of individuals so essential to the progress, welfare, and happiness of mankind. It has long been recognized by courts and economists that it is just as essential that men's services be freely for sale, as that property should not be allowed to be withdrawn from the market for an indefinite length of time. Both of these principles are based upon a sound public policy. Opposed to the unlimited application of this principle of freedom of trade is the equally well recognized principle of.

freedom of contract, which in its essence is also natural and inherent in the individual, and which in innumerable cases the courts have recognized and enforced. And here, again, the public has a real and vital interest, because if, recognizing the right to contract, one who does contract can, without loss or penalty, disregard his obligation, there would be brought about such a chaotic condition in the business, industrial, and financial world as to result in practical stagnation. It therefore seems clear, in considering the question now presented, that the rights and interests of the employer, the employee, and the public at large must be considered.

It was early recognized that a decree of specific performance against an employee under an ordinary contract of employment might result in a species of industrial servitude, which the courts would not require to be performed; and following this line of reasoning, they held, in cases in which specific performance would not be decreed, that injunctive relief in aid of specific performance would not be given. Later this rule was modified to the extent of holding that, in cases where the employment necessitated that the employee have a special individual qualification, or the service was of an unusual and unique character, and the contract for such service contained a restrictive covenant, the breach of such a covenant would be enjoined.

In the contract before us there is no restrictive covenant applicable to the term of the employment, but here it comes into force after the termination of the employment, and prohibits the employee from engaging in the same business over the same route, for himself or another, for a definite period after the termination of the employment. The objects to be attained by such a covenant, effective during the term of the employment, and one only to take effect at the termination of the employment, are essentially different. In the first instance, the primary purpose of the restrictive covenant is to enforce service by the employee to his employer during the term of the contract, while, in the second, the purpose is to prevent unfair competition by the employee or his subsequent employer, through the employee engaging in the business of

the first employer, for a limited time in a definite and restricted area. The last mentioned purpose is that sought by the restrictive covenant in the contract before us, and is more analogous to contracts of sale including good will, than it is to contracts of employment containing restrictive covenants the purpose of which is to enforce service during the term of the contract.

It has been held that, upon principle, agreements imposing restraints upon the right of an employee to engage in a competing business after the termination of the contract of service are to be determined by the same test as that applicable to agreements ancillary to the sale of a business. In the case of *Eureka Laundry Co. v. Long,* 146 Wis. 205, the court, in dealing with this question, said: "The question arises, Does it make any substantial difference whether the thing of value bargained for is contained in a contract of sale, or in a contract of hiring? If it is lawful and proper to protect a business just about to be acquired from certain acts by the seller, who is familiar with such business, why is it not equally lawful and proper to protect an established business from such acts by one who has become familiar therewith? We perceive no difference in principle. The purchaser says to the seller: 'You are familiar with this business. You know your customers. Your personal acquaintance with them is such that you could divert their trade from me if you saw fit. Now, I will purchase your business upon the express condition that you will agree for a limited length of time not to engage in a like business in this locality; at the expiration of that time I shall know my business and my customers well enough to be able to protect myself.' So the owner of an established business says to a prospective employee: 'In the employment, you will become familiar with the customers of my business in a way that I cannot; you will meet them frequently, while I see them rarely, if ever. Now, I will hire you upon the express condition that you will agree for a limited length of time not to solicit trade from such of my customers as you may have supplied while in my employ, and will not engage in my business

within a limited time in the territory you have occupied. At the end of that time my new employees will be sufficiently well acquainted with my customers, to protect my business.' Why is not one contract as valid as the other? Both are based upon valuable considerations. If it be said that the latter contract tends unreasonably to hamper employees in their quest for employment, the answer is: Whatever is reasonably necessary for the protection of a legitimate business promotes the best interests of the employees of that business." 13 C. J. 485. In the recent case of *Burnham v. Burnham*, 153 Md. 147, and the second appeal thereof (154 Md. 349), which was a receiver's sale of a business for the manufacture and sale of ice, including the good will thereof, we held that a partner in the former business should be restrained from soliciting the customers of the copartnership, and this for the reason that the sale of the good will carries with it, as a valuable part thereof, an implied restriction against a former partner soliciting, after the sale, customers of the old partnership.

In our opinion, there is no valid distinction between a court of equity enforcing by injunction this restrictive implication, and enforcing the specific restrictive covenants contained in the contract in this case. The parties to this contract agreed to the restrictive covenant, and, if its terms are fair and reasonable, a court of equity should enforce its provisions by granting injunctive relief. The question of whether it is reasonable depends upon circumstances, the more important of which are: Is the purpose to be obtained a fair and conscionable one, will it do greater harm to the employee than good to the employer, and if it is reasonable as between the parties, does it so injuriously affect the public as to make it void as against public policy? The compensation paid the employee here was as well based upon his compliance with the restrictive covenant as his rendering service. The character of the service rendered, and which had been rendered by the appellant since 1916, was such as necessarily brought him into frequent if not daily contact with the customers served with the appellee's products. The executive and

managing officers of the appellee rarely, if ever, saw its customers, the personal contact being between the customers and the appellant, and for practical purposes they might well be said to be customers of the appellant rather than of the appellee. Knowing, from the nature of the business, that this was true, it was, in our judgment, entirely reasonable for the employer to include in the contract such a restrictive covenant, and the purpose or object to be secured fair and conscionable. It was, in effect, saying to the appellant: "The product which we are selling is a staple one, and differs so slightly from similar products sold by our competitors that the quantum of our sales over the route served through you will depend largely upon your tact and demeanor when coming in contact with the purchasers. The quality of service rendered by us depends upon you. Your sales, and therefore your compensation, are dependent to a large degree upon your courtesy and demeanor while traveling over the route, and the customers will come to look upon you as the bakery man, rather than be guided by any special preference they may have for our products. Therefore, in consideration of your compensation, we ask that when you leave our employ, either of your own accord or by reason of discharge, that you will not engage in selling bakery products for yourself or other persons over the route served by you, for the period of three months, which we think is a sufficient time to enable a new employee to become acquainted with our customers and protect our business." The purpose being fair, the method of accomplishment is reasonable. We are of the opinion that an employer, under such circumstances, is entitled to the protection which this covenant affords. Neither do we think that its terms are harsh, or impose any hardship upon the employee which outweighs the protection to which the employer is entitled. It does not restrict him from entering the employ of any other bakery company immediately upon his leaving the appellee, nor does it restrict him from engaging in the sale of bakery products for himself or future employer over any area other than the comparatively small territory described in the contract, and not over that except for the

short period of three months. Again, we can see nothing inimical to the public interest resulting from the enforcement of this restrictive covenant. The people at large, with the exception of those along this one particular route, are entitled to be served with bakery products by the appellant. He can engage in this character of business for himself, and his services are for hire to any other bakery company, to cover all territory except the single route mentioned in the contract, and then only, as to that, for the period of three months. We find, as between the parties, that this covenant should be enforced; and when we apply to it the test of the public's interest, we do not find any such injury as would render it void as against public policy. While the principles involved would not be changed, it is clear that, although the parties to the cause are the parties to the contract, the real parties interested in the outcome of this appeal are the two competitors in the bakery business, the appellee and the present employer of the appellant.

If the contention of the appellant were adopted, it would result in having the law so established as to enable any competitor in a business, such as the bakery business, conducted along the lines indicated by this record, to offer an inducement to a particularly successful and popular salesman on a particular route to leave his former employer and engage his services to the competitor, in order that it may benefit at the expense of the former employer, without giving it a reasonable time to protect its own business upon such a contingency, even though the former employer had foreseen the injury which might result and guarded against it by a contract freely and voluntarily entered into by its employees. If this were not the purpose, why did not the present employer of the appellant put him to work on a different route, where there were no restrictions of any kind? It manifestly was not for the purpose of benefiting the employee so much as for benefiting themselves by inflicting as much harm upon a competitor, the former employer, as possible. This is not a case of restricting an employee from getting subsequent employment by reason of his knowledge or skill acquired by

experience in a similar business under a former employer, but is a case where the violation of his negative covenant enables him to sell his services to a competitor for a higher wage than he would naturally be able to obtain if he had not violated the covenant, and to the detriment and damage of his former employer.

What we have said is in accord with the weight of authority outside of this state. In the annotations to the case of *The Samuel Stores v. Abrams,* 9 A. L. R. 1456, 1458, the author states: "It is clear that if the nature of the employment is such as will bring the employee in personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers, enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business, either for himself or for another, providing the covenant does not offend against the rule that, as to the time during which the restraint is imposed, or as to the territory it embraces, it shall be no greater than is reasonably necessary to secure the protection of the business or goodwill of the employer." As sustaining that statement, there are cited a large number of cases illustrating the rule in the federal courts, and courts of last resort in many of the states, and in England. These cases illustrate the enforcement of such a covenant where the time is of much greater length, and the territory embraced much larger, than in the present case, all of which were held to be reasonable. Indeed, we have found no case wherein the restrictions as to time and place are as limited as here, and therefore no case in which the reasonableness of these restrictions was so clear and manifest.

The appellant relies largely upon the case of *Rosenstein v. Zentz,* 118 Md. 564. In that case the object sought by

the injunction was to restrain the employee from engaging himself to a competitor for similar employment during the term of his contract, the purpose being to specifically enforce his contract of service with the employer by restraining him from hiring himself to a competitor. The employment in that case was not extraordinary or unique, and required no skill or talent of a particular kind; and this court held that in such a case the employer had a full and ample remedy by a suit at law for a breach of the covenant; whereas, in the case now before us, the primary object of the restrictive covenant is not to require service, because under the terms of the contract that has ended, but to restrain the employee after the termination of the service from engaging in that business for a very limited time and over a circumscribed area, so that the employer can protect himself from the damage resulting to him, with no corresponding or superior benefit to the employee. The distinct and different purposes sought in these two cases, one being what the courts have designated as a species of industrial servitude, and the other a reasonable covenant for the protection of the employer from damage, clearly differentiate the two cases, the latter being, as we have said, analogous to and governed by the same general rules applicable to restrictive covenants in the sales of business and good will. In addition, in that case we were dealing with a traveling salesman selling pianos and musical instruments to the trade in Maryland, Virginia, and the District of Columbia.

As was pointed out by the Supreme Court of Rhode Island in the recent case of *Colonial Laundries, Inc. v. Henry,* 48 R. I. 332, 338, which was a case involving a laundry route, speaking of traveling salesmen: "Their custom is sought from any persons who are engaged in certain lines of business, and whose identity may be quickly known to any one who cares to examine a directory or trade index. In cases involving milk, ice, laundry and tea routes, a list of customers cannot be thus obtained; a definite selected group has been gathered together by the employer, not of persons who may deal with him, but who, if not specially

solicited otherwise, almost certainly will do so. In trade, generally, the traveling salesman has no assurance of an order unless he can satisfy the customer that his merchandise is cheaper, better, or more salable than his competitor's. The customer each time desires to examine, inspect, and compare merchandise and prices offered to him. Each sale is a distinct transaction, carrying no implication that another will follow. The list of people upon whom he calls has no market value, apart from a general good opinion of the employer's methods and goods and prices. A particular laundry route has a definite market sale value. The given customers pay little attention to whose services they receive. The quality of the service rendered is so similar that the customer invites the person rendering the service to call at definite periods and to keep on rendering such service until further notice."

In the case of *Fulton Laundry Co. v. Johnson,* 140 Md. 359, dealing with a laundry route, in which case there was no written contract, and where the employer undertook to restrain the employee from engaging in the laundry business for himself and soliciting former customers, this court, speaking through Judge Adkins, said: "The theory of the appellant is that the list of customers of the appellant is a trade secret, and that an employee who has obtained the names of customers, and has acquired his good standing with them by reason of the opportunity derived from his employment, should not be permitted to use such information, or capitalize his popularity thus acquired, to the injury of his employer after the termination of his service. We have been referred to no decisions by this court, nor have we been able to find any, bearing directly on this question. The decisions in this country and in England seem to be fairly harmonious in principle as to the duty of courts to protect owners of trade secrets from disclosure by employees, but the divergences begin when the question to be determined in particular cases is whether the thing sought to be protected should be classed as a trade secret. And this is the real question presented by this case." The court deter-

mined that the customers served in the laundry business did not constitute a trade secret, and therefore refused injunctive relief, but added this pertinent language: "Of course, there is nothing to prevent an employer from expressly contracting with his employee that the latter shall not, on leaving the employer's service, solicit business in the same line from the customers of the employer in a particular territory, and, if by reason of the nature of the laundry business such protection is necessary, it can easily be secured by such contracts." It is true that the language just quoted was not necessary for the decision of the question involved in that case, but the statement is so unequivocal that we feel constrained to follow it, especially in view of the fact that it is in accord with what we conceive to be the weight of authority elsewhere. That case, like the present, was an endeavor to restrain by injunction an employee from engaging in a similar business after the termination of the employment; but, unlike this case, there was no contract containing a negative covenant agreeing not to engage in the employment after the termination of the service. The inescapable inference from the language used in that case is that, had there been a contract containing negative covenants, as in this case, the decision of the court would have been the reverse of what it was. It expressly says that there is nothing to prevent an employer from making such a contract as in this case, and if, by reason of the nature of the business, such protection is necessary, it can easily be secured by such contract. Having used that language, it cannot be argued that a contract such as that described would not be given effect by this court, otherwise the protection of the business, which the court said could be easily secured by such contract, would have no meaning or effect. In other words, it would be necessary to argue that, when the court said such a contract would afford protection to the employer, it did not mean what it said. We find no error in the action of the lower court, and its order must be affirmed.

*Order affirmed, with costs to the appellee.*