JAMES S. HEBB, III *v.* STUMP, HARVEY
AND COOK, INC. ET AL.

[No. 559, September Term, 1974.]

*Decided April 3, 1975.*

The cause was argued before THOMPSON, POWERS and GILBERT, JJ.

*Francis D. Murnaghan, Jr.*, with whom was *Daly D. E. Temchine* on the brief, for appellant.

*Thomas D. Washburne* and *Thomas W. Coons* for appellee.

THOMPSON, J., delivered the opinion of the Court.

This appeal concerns the applicability and scope of covenants not to compete in an employment contract entered into between Stump, Harvey and Cook, Inc., (Stump) an insurance agency, and James Hebb, (Hebb) a former employee. The contract was executed on May 21, 1971 several months after Hebb began work for Stump. After terminating Hebb's employment for cause in December 1973, Stump filed a Bill of Complaint asking the Circuit Court of Baltimore City to enjoin Hebb from violating covenants not to compete in the employment contract. The trial judge, William J. O'Donnell, enjoined appellant from engaging either directly or indirectly in writing or in soliciting the writing of contracts of insurance of those customers of Stump who became customers of Stump subsequent to May 21, 1971, but not including those customers of Stump who were customers of Hebb prior to his employment with Stump.

Appellant raises three contentions on appeal:

> "1. The agreement does not bind Hebb not to compete in the event of a unilateral discharge for cause before the end of a term.
>
> "2. The restrictive covenant is unnecessarily broad

in scope, and, therefore, its terms are not enforceable.

"3. The restraints imposed by the injunction issued by the court below are without justification in law or in fact, and they are not founded on a proper construction of the agreement between the parties."

The agreement provides as follows:

"In consideration of the compensation to be paid by us and received by you, as set forth below, you agreed to devote your full time and best efforts to the business of Stump, Harvey & Co., Inc.

"Stump, Harvey & Co., Inc. agrees to employ you for the current year, ending December 31, 1971, and provided performance of your duties is deemed satisfactory by Stump, Harvey & Co., Inc., your employment will automatically be renewed for another calendar year, upon the same terms (except as to the subsequent provision hereof with respect to non-competition). Thereafter, this agreement will automatically be renewed from year to year unless terminated by either party as hereinafter set forth.

"1. Commissions shall be credited to you in accordance with our formula for our solicitors as it may be in effect from time to time.

"2. You will be authorized a drawing account of $200.00 per week which will be applied against your commissions.

"3. In addition, we will pay you a weekly salary of $100.00 per week against which, however, will be charged any gross commissions earned by you in excess of $20,800.00 per year according to the following formula:

"a. 50% of commissions earned by you in any one year in excess of $20,800 shall be charged against your salary each year, but in no event shall such total charges in any

one year exceed $3,000.00. To the extent that said 50% of such excess annual commissions earned by you exceeds $3,000.00, then the excess of said 50% over $3,000.00 will be paid to you.

"b. The remaining 50% of annual commissions earned by you in excess of $20,800.00 shall be paid to Stump, Harvey & Co., Inc.

"4. It is further agreed that if, after this year (1971) you cease to be employed by Stump, Harvey & Co., Inc. you will refrain, for a period of one year (or for a period of two years in the event of a renewal for an additional year or more) beginning with the date of such termination from engaging either directly or indirectly in writing or soliciting the writing of contracts of insurance of our customers, and prospective customers who were being actively solicited by us at or before the effective date of such termination.

"5. This agreement may be terminated for cause by Stump, Harvey & Co., Inc. at any time upon ten days notice but it may only be terminated otherwise upon sixty (60) days notice prior to the end of a calendar year. In the event you terminate this agreement prior to the end of any year the applicable non-competition provisions shall be fully binding upon you, on a one-year basis depending upon the year of such termination.

"If this letter correctly reflects the understanding which we have reached, will you please sign the form of approval which appears below.

"Upon approval by you, this letter will constitute the full and complete understanding between us. This agreement may be modified or amended, but only in writing, and only with the assent of both parties."

## I The Applicability of the Agreement

Appellant first argues that the agreement's covenants not to compete are not binding because his employment was terminated for cause by the appellee. We see no merit in the argument and we adopt the relevant portion of the trial court's opinion as follows:

"In summary, the Respondent argues that Paragraph 4 cannot apply to a 'discharge for cause' since by its terms it came into play only after the year 1971, and that its language suggests that it was intended only to deal with the termination by the normal expiration of the calendar year-by-year employment term or a renewal thereof; that a termination under Paragraph 5 ('for cause') could not therefor be covered by the provisions of Paragraph 4, but would be dependent solely on the language of Paragraph 5. [Counsel argues that such interpretation is reinforced when it is considered that the duration (of two years) as set forth in Paragraph 4, could not apply to a unilateral termination on the part of the employee — in connection with which Paragraph 5 fixes a one (1) year restriction on him as to competition.]

"Counsel, in summary, as to Paragraph 5, urges that it is the only clause relating to unilateral termination 'for cause' by the employer and must be read in interrelationship to the other clauses in Paragraph 5.

"It is well established that language in a contract prepared and included by one party is to be construed against that party if there is an ambiguity. *Lakrest Development Co. v. Eisele,* 258 Md. 45, 50 (1970), *Kelley Construction Co. v. Washington Suburban Sanitary Commission,* 247 Md. 241, 250 (1967), *Cadem v. Nanna,* 243 Md. 536, 544 (1966) and *Hughes and Co. v. Pioneer Fire-Proof Door Corp.,* 230 Md. 36, 38 (1962).

"In *Sagner v. Glenangus Farms*, 234 Md. 156 (1964), the Court stated (Pg. 167):

'A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed. We can find no sound reason to read the completion clause out of the contract. *Kimmel, Tr. v. W. T. Grant Co.*, 233 Md. 466, 469; *Lumber Co. v. Bldg. & Savings Assn.*, 176 Md. 403; *Hart v. Hart*, 165 Md. 77, 80; *Waters v. Griffith*, 2 Md. 326, 333; 17A C.J.S. *Contracts* Sec. 309, pp. 163-164. We think a reasonable person in the position of the parties would have thought the completion provision and the contract as a whole meant what Sagner says it meant and, therefore, that construction is the true meaning of the agreement. *Ray v. Eurice*, 201 Md. 115, 127.'

"In *Mattingly Lumber Co., et al. v. Equitable Building & Savings Assoc.*, 176 Md. 403 (1939), in connection with the construction of a hypothecation agreement, the Court stated (pp. 407-8):

" * * * There are well established rules to aid the courts in construing contracts, where there is doubt as to the intention of the parties. The language employed, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design, have always been accepted as guides of first importance in arriving at the intention of the parties. *Lambdin v. Dantzebecker*, 169 Md. 240,

245, 246, 247, 181 A. 353; *Danzer & Co. v. Western Maryland Railway Co.*, 164 Md. 448, 462, 165 A. 463; *Myers v. Myers*, 153 Md. 44, 48, 137 A. 501; *Ess-Arr Knitting Mills v. Fischer*, 132 Md. 1, 8, 103 A. 91; *Phoenix Pad Mfg. Co. v. Roth*, 127 Md. 540, 544, 96 A. 762. * * * '

"Equally well settled is the rule that where two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it. * * * '

"In *Slice v. Carozza Properties, Inc.*, 215 Md. 357 (1958), Chief Judge Brune, writing for the Court, stated (pg. 368):

'As we turn to the authorities, we may note first that the theory of "objective law" of contracts has been almost universally adopted by this time. The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake. *Ray v. Eurice*, 201 Md. 115, 93 A. 2d 272.'

"See also *U.S.I.F. Triangle Towers Corp. v. Rockwood Development Co.*, 261 Md. 379, 384 (1971) and *Monticello v. Monticello*, 271 Md. 168, 173 (1974), where (in connection with the interpretation to be given a decree) the Court stated that the question was 'What a reasonable person in the position of the parties (or of the Court) would have thought it meant'. (271 Md. 168, 173).

"Paragraph 4 must thus be construed as having been intended between the parties to be a

non-competition covenant, applicable generally to a cessation of the employer-employee relationship — by whatever means such cessation or termination came about.

"Although the Respondent entered into the employ of the Complainant on about March 1, 1971, it was not until May 14, 1971 (Complainant Exhibit 1) that the employment agreement was submitted to him in writing, and it was not accepted by him until May 21, 1971 — thus (until December 31, 1971), it had only seven (7) months duration, and it is not illogical to assume that had the employment agreement been terminated — for any reasons — in the remainder of that calendar year there would have been no need for the employer to undertake to protect itself.

"Paragraph 5 undertakes to set up 'time periods' for 'termination for cause' and for 'termination by non-renewal' by providing in the one case that the employer (where 'for cause') give the employee ten (10) days notice and in the other (non-renewal) sixty (60) days notice.

"Although the last sentence in Paragraph 5 could have been more aptly stated, it provides that if the employee undertakes by his action voluntarily to terminate the agreement prior to the end of any calendar year the applicable non-competition provisions (set forth in Paragraph 4) shall be fully binding upon him, 'on a one-year basis depending upon the year of such termination', *i.e.*, for a period of one year if terminated by him during 1972, or for a period of two (2) years in the event of a renewal for the year 1973 (by incorporation of the provisions thereinabove set forth in Paragraph 4 concerning the duration of any period of non-competition). Although it might be considered redundant, it is not in conflict with the provisions of Paragraph 4, but at best could be classified as a re-statement of

the applicability of the non-competition provision set forth in Paragraph 4. It cannot here be construed as having been within the intention of the parties that if it became necessary for the employer to terminate the employee 'for cause' he was not then subjected to any agreement not to compete.

"The Respondent, prior to his association with the Complainants, had been engaged as a solicitor or producer of insurance with Donald E. Grempler, Inc., where he had executed a 'non-competition clause', and also had been in the employ of Gilbert A. Dailey and Company, where he was *not* under such a 'non-competition clause.' [Complainant's Exhibit 10, under which he had agreed that he would not

'during the life of this contract nor within two years of its termination, for any cause whatsoever, whether with or without his fault, engage or become interested, directly or indirectly, in the business of writing insurance, either as principal, partner, agent, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatever in those sections of Baltimore County known as Towson, Timonium, Lutherville, Dulaney Valley, Cockeysville, Ruxton, Riderwood or Rodgers Forge.'

"His letter of termination 'for cause', dated December 3, 1973, Complainant's Exhibit 2, gave him the ten days notice of termination and advised that he was expected 'to abide with the terms of the employment contract as respects "non-competition" '. The testimony further disclosed that the Respondent at the time of the 'parting of the ways' orally recognized his responsibility under the provisions of Paragraph 4.

"It might be parenthetically observed that in

cases of termination 'for cause' by the employer there are often engendered elements of hostility, ill will and malice [although no such elements are here established] which would give greater rise, under such terminations 'for cause', for the employer to be required to protect itself from the competition of an employee leaving its employ under such circumstances.

"The Court concludes that the non-competition provisions set forth in Paragraph 4 are applicable and binding where the employee has 'ceased' to be employed, even though the termination of the employment was 'for cause'."

## II Validity of the Agreement

Appellant next contends that the covenants not to compete are invalid because they are over-broad in that they contain no geographic limitation and they attempt to prevent appellant from dealing with prospective customers of appellee and thus the trial court should not have enforced any part of the clauses.

The trial court found that the lack of a specified geographical area was not crucial and further that the restrictions against dealing with prospective customers of appellee could not be enforced. He did, however, enforce the remainder of the restrictions. We agree with his approach.

The rule regarding the validity of covenants not to compete in an employment contract was succinctly set out by the Court of Appeals in *Becker v. Bailey*, 268 Md. 93, 96-97, 299 A. 2d 835 (1973):

"The general rule in Maryland is that if a restrictive covenant in an employment contract is supported by adequate consideration and is ancillary to the employment contract, an employee's agreement not to compete with his employer upon leaving the employment will be upheld 'if the restraint is confined within limits which are no wider as to area and duration than are

reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public.' *Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 123-124, 225 A. 2d 288, 291 (1967); *MacIntosh v. Brunswick*, 241 Md. 24, 215 A. 2d 222 (1965). While such restrictions may be enforced under some circumstances, there is no sure measuring device designed to calculate when they are. Rather, a determination must be made based on the scope of each particular covenent itself; and, if that is not too broad on its face, the facts and circumstances of each case must be examined. *Ruhl v. Bartlett Tree Co., supra.* When such an analysis is made, some restrictive covenants are deemed enforceable while others are not."

The rule that a covenant not to compete, which is over-broad as to area, will not be enforced is applicable in certain situations typified by *Ruhl v. F. A. Bartlett Tree Expert Co.*, 245 Md. 118, 225 A. 2d 288 (1967) and *MacIntosh v. Brunswick*, 241 Md. 24, 215 A. 2d 222 (1965). In *Ruhl*, the employee was prevented from competing with his employer in a 5 county area. In *MacIntosh*, the employee was prevented from "[e]ngaging directly or indirectly in any business activity substantially competitive with the business of the [employer]" which under the facts would have precluded such activity in the entire United States. The Court held in both cases that the restriction could not be enforced because the geographical area within which the restriction applied was too large. Such a complete prohibition against a former employee is justified only where its geographical limit is well defined and no wider than is necessary to protect the legitimate interests of the employer. In the case at bar, however, the appellant is not prevented from selling insurance in any given geographical area. He is prevented only from selling to persons who are customers of appellee. The trial court correctly limited the class of prohibited customers by excluding those appellant

brought with him and those who were described as prospective customers in the agreement.

The instant case is very closely analogous with *Gill v. Computer Equipment Corporation,* 266 Md. 170, 292 A. 2d 54 (1972) and *Tuttle v. Riggs-Warfield-Roloson,* 251 Md. 45, 246 A. 2d 588 (1968).

In *Gill* the court upheld an employment contract provision which prevented the employee, for a period of two years, from "working in an executive, administrative, sales or service capacity for any manufacturer which was represented by the Peripheral Systems Division during all or any part of the one (1) year period immediately preceding the date" of the appellee's termination. In *Tuttle* the Court upheld a similar clause in which the appellee agreed to "refrain, for a period of two years beginning with the effective date of such termination, from engaging either directly or indirectly, in any insurance activities with *customers* of Riggs-Warfield-Roloson, Inc." (Emphasis added). The Court in both of these cases stressed the fact that prohibition was limited to a specific, identifiable class. The Court in *Gill* stated:

> "He [employee] was restricted in his employment only as to customers of that division. He was otherwise free to operate whenever and wherever he chose. The restriction was not unreasonable. *Tuttle* [*Tuttle v. Riggs-Warfield-Roloson, supra*] is controlling here." *Gill v. Computer Equipment Corporation, supra* at 181.

The appellant contends that the trial court, having found the restriction against dealing with prospective customers unenforceable, should have denied enforcement of the restriction *in toto.* In support of his argument appellant, citing *W., B. & A. R. R. Co. v. Moss,* 127 Md. 12, 96 A. 273 (1915), recites the general rule that "[i]t is not for courts to make contracts for parties." The appellant however overlooks the factual conditions which must exist before that rule is applied. Those conditions were stated by the Court in *W., B. & A. R. R. Co. v. Moss, supra* at 20:

> " 'The law is too well settled' said Judge Miller, in
> *Thomson v. Gortner*, 73 Md. 475, 'to admit of doubt,
> that in order to constitute a valid verbal or written
> agreement, the parties must express themselves in
> such terms that it can be ascertained, to a
> reasonable degree of certainty, what they mean.
> And if an agreement be so vague and indefinite that
> it is not possible to collect from it the full intention
> of the parties, it is void; for neither the Court nor
> the jury can make an agreement for the parties.
> Such a contract can neither be enforced in equity
> nor sued upon in law.' "

In the instant case clauses 4 & 5 were not so vague and
indefinite that the intent and meaning of the parties could
not be ascertained.

Whether a restriction preventing competition should be
enforced at all where one of its parts has been found too
broad was discussed in 4 *Williston on Contracts* (3rd Ed.
1961) § 1647B at 287-288:

> "Although a contract may contain excessively
> restrictive promises which are unenforceable, the
> contract may not be invalidated in its entirety
> where its general purpose is lawful. Moreover,
> although one of several covenants in restraint of
> trade is legally excessive, the separable restrictive
> promises, which are lawful, will be enforced. This is
> true where the restraint is over-broad in its
> definition of the circumscribed territory, its
> duration, the nature of the business activity
> affected, or of the classes of persons with whom the
> promisor engages not to do business."

In 2 *Restatement of Contracts* § 518 (1932) the same rule is
stated as follows:

> "Where a promise in reasonable restraint of
> trade in a bargain has added to it a promise in
> unreasonable restraint, the former promise is
> enforceable ...; but if full performance of a

promise indivisible in terms would involve unreasonable restraint, the promise is illegal and is not enforceable even for so much of the performance as would be a reasonable restraint."

Comment (a) of that section adds:

". . . the fact that a covenant in restraint of trade is more extended than the law allows will not preclude the enforcement of separable lawful restrictive promises."

Professor Williston succinctly summarized the general rule as follows:

" '. . . a contract in restraint of trade will be enforced to the extent that it is reasonable and lawful, the test being whether partial enforcement is possible without injury to the public and without injustice to the parties.' "

The types of restrictions which typically have been held to be separable fall into four categories: (1) restrictions which cover an excessive area; (2) restrictions which cover an excessive time; (3) restrictions which are too broad in the nature of business included; and (4) restrictions which are too broad in the classes of persons with whom the promisor engages not to compete. *Williston, supra,* § 1647B n. 14; *Restatement of Contracts, supra,* § 518 comment (a).

In the case at bar the restriction exercised by the trial court falls squarely within the fourth category listed above. It was not so interwoven as to be logically inseparable from the rest of the contract and was thus severable. *Connolley v. Harrison,* 23 Md. App. 485, 327 A. 2d 787 (1974), *cert. denied,* February 21, 1975. *See Tawney v. Mutual System of Maryland,* 186 Md. 508, 47 A. 2d 372 (1946), wherein the Court separated the non-competition clauses in an employment contract containing a severability clause, but without referring to the severability clause, and *American Weekly, Inc. v. Patterson,* 179 Md. 109, 115, 16 A. 2d 912 (1940), wherein the Court separated a non-competition

clause in a sale of a business situation. In the instant case the partial enforcement of the restrictions works no injury to the public and creates no injustice to the parties, thus the restrictions are severable and thus partially enforceable.

### III Meaning of the Term "Our Customers"

The decree fashioned by the trial court included in the class of customers with whom appellant could not solicit all persons whose accounts went on Stump's books after May 21, 1971 (the date of the contract) but excluded prospective customers of Stump and any customer whose account appellant brought with him when he first affiliated with Stump. Appellant claims the trial judge incorrectly defined the term "our customers" in clause 4 of the contract as customers produced by anyone working for Stump. Appellant urges that the term should be interpreted to exclude customers whose business was generated by appellant, while he was employed by Stump. We agree with the trial judge that the only reasonable interpretation of the term "our customers" in the context in which it was used is that it includes customers generated by appellant while he was employed by Stump. The trial court expressed it in the following way:

"As was stated in *Tolman Laundry, supra* [171 Md. 7, 187 A. 836 (1936)]: 'The customers and patronage thus secured were for the benefit of the employer, and the increased good will became the property of the master, however much their procurement was to be attributed to the servant's energy, personality, and skill. Since the servant was hired and rewarded to produce these results, the employer had the right to their enjoyment. * * * '. [171 Md. 12.] Similarly in *Deuerling, supra,* [155 Md. 280, 141 A. 542 (1928)], the Court pointed out the 'good will' of the employer which was the subject of the non-competitive agreement. In *Silver v. Goldberger, supra,* [231 Md. 1, 188 A. 2d 155 (1963)], the Court recognized that restraint may be

justified 'if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee'. [231 Md. 7.] See also *John Roane, Inc. v. Tweed*, 89 A. 2d 548, 33 Del. Ch. 548, 41 A.L.R.2d 1 (1952), where the Supreme Court of Delaware, construing Maryland law, held that 'reasonable restrictions against competition to prevent the pirating of the employer's good will will be enforced, provided such restrictions extend no further than the necessities of the case dictate.' "

> *Decree affirmed.*
> *Appellant to pay costs.*